# Lewis v. Commonwealth.

June 11, 1948.

Joe Hobson for appellant.

A. E. Funk, Attorney General, and Joe M. Ferguson, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Affirming.

The appellant, Mack Lewis, was convicted in the Floyd circuit court of voluntary manslaughter and punished with two years' confinement in the penitentiary at the trial of an indictment accusing him of wilfully murdering Casey Newsome. The homicide occurred in the village of Drift in Floyd County on March 1, 1946, in the late afternoon at the residence of the deceased. There were two trials, the first one resulting in a hung jury, but at the second one he was convicted with affixed punishment as above stated.

Appellant's motion for a new trial contained seven

alleged prejudicial errors authorizing a reversal of the judgment which are, (1) the admission of incompetent evidence offered by the Commonwealth; (2) refusal of competent evidence offered by defndant; (3) the verdict is not sustained by the evidence; (4) the verdict is flagrantly against the evidence and returned by the jury under the influence of passion and prejudice; (5) the court erred in instructing the jury and in failing to give the whole law of the case; (6) improper remarks by prosecuting counsel in his closing argument, and (7) error of the court in overruling appellant's motion to discharge the jury and continue the case because of the **remark** complained of in ground (6). We find nothing in the record even remotely sustaining grounds (1) and (2), and our opinion will be confined exclusively to a brief consideration of the other five grounds.

**At the time of** the homicide the deceased and his wife resided in an apartment building in the village of Drift. It was only a one-story building with the various apartments separated by a partition wall and occupied by separate families. One of the apartments immediately adjoining that of Newsome was occupied by Eli Prater and his family consisting of himself and his wife; a son, Asa, age 15; a daughter, Carrie, age 13; and a young son only two years old.

The widow of the deceased married one Duff after Newsome's death. In testifying for the prosecution she gave a history of what the deceased did throughout that day, including his taking four or five drinks of whiskey for the relief of a more or less severely painful shoulder. She testified that late that afternoon she started to a store to get supplies for supper and on her way she heard five shots in the direction of her home and immediately returned thereto and found that her husband had fired his pistol four or five times through the floor of the front porch. She further testified that about that time the appellant, who was a deputy sheriff of the county, and Otto Fannin, another deputy, approached the house and that appellant went up on the porch while Fannin stood behind an automobile of deceased parked immediately in front of his apartment and that "we (she and her husband) were standing in the door when they came up." (Our parenthesis.) Witness then testified that appellant asked her husband if he was the

one who had done that shooting to which he gave an affirmative answer. She then said: "* * * and Mack said: 'Don't you know it is the wrong thing to do?' and Casey said: 'Yes, I guess it is, but I am at home and I am not bothering anyone.' Mack pulled his pistol and shot him twice."

Witness also stated that her husband had no pistol in his hands, nor did she see one upon or about his person; that appellant did not attempt to arrest him nor inform him of his intention to do so; that her husband fell backward on the floor when appellant reached under him (the deceased) and got his pistol and said, "Now, G—— d——, I have got you this time." She further testified that her husband was carried to the hospital, but died within a short time after he was shot.

Asa Prater, who was on the porch at the time of the shooting, immediately in front of the adjoining apartment, testified that the deceased and his wife were quarreling just before the latter started to the store and deceased said to her, "If you don't come back, I will shoot the place all to hell;" that shortly after the wife's departure he fired five shots through the floor of the porch. Witness was then asked: "What happened then?" to which he answered:

"Mack came up and asked Casey what he was doing, and Casey said: 'Just playing,' and Mack said: 'That's no way to play,' and Casey said: 'I do as I God-damned please,' and when Casey said that Mack shot him. After he shot him Mack went in the house and picked up his gun and throwed his hand back down and said: 'You God-damned son-of-a-bitch, you will kill nobody else.'" Witness further stated that after the five shots were fired by deceased he then put the pistol in his hip pocket with the muzzle pointed upward which was the last time witness saw it until after the homicide was committed.

The witness, Carrie Prater, testified that she was present just before the shooting and saw the approach of the two officers and heard appellant say to his fellow officer, Fannin, just before reaching the apartment of the deceased, to stand by—that he would do the shooting, and that Fannin at that time was standing behind the parked car of the deceased in front of the apart-

ment. In giving her testimony as to what happened at the time of the shooting she said:

"Mack said: 'Were you the one that was doing that shooting?' and Casey said: 'You are damned right,' and Mack said: 'Don't you know you shouldn't be doing that?' and Casey said: 'I do as I damn please,' and Mack shot him.

"Q. How long after that was it until Mack shot him? A. Just as soon as he got it out of his mouth he shot him.

"Q. What was Casey doing at that time? A. He wasn't doing anything."

The substance of appellant's testimony, after denying all of the guilty testimony given by the three prosecuting witnesses, was that he was a deputy sheriff, a miner by profession and that he resided in Salisbury and came to Drift to return some papers to Esquire Stumbo who resided in or near that village; that he was about 150 yards from Newsome's residence when he heard some shooting in that direction and when he looked in that direction he saw deceased on his porch firing his pistol out into the street; that Otto Fannin at that time was in the restaurant of Leck Blackburn and, after hearing the shots, went out of the restaurant and joined him and the two went to the home of the deceased to investigate the shooting; that when they arrived he went upon the porch, with Fannin standing on the steps near the top. He then testified that:

"I went out to Casey's to talk to him, and Casey and h's wife were standing in the door. I walked up and put one foot on the doorstep and this arm (Indicating) on the door, and I said: 'What in the world do you mean by shooting on the public highway,' and he said: 'I shoot where I God-damn please and when I God-damn please, and you son-of-a-bitch you have just got a minute to get away from here,' and he started up with h's gun, and when he started up with his gun it hit his wife's arm, and when he did that I shot.'' Appellant further testified that he shot deceased in his necessary self-defense. He acknowledged that when he arrived Mrs. Newsome was standing in the door to the right of her husband, but that he d'd not see any of the Prater children on the porch.

On cross-examination appellant testified that the shooting by deceased was into the floor of the porch, contrary to what he had testified in chief, and that when he picked up the pistol supposed to have been carried by deceased it was cocked and he thereupon called attention of that fact to Fannin although other testimony in the case shows that he had time before exhibiting it to Fannin to have cocked the pistol himself. He admitted that he did not arrest the deceased, nor did he inform the latter of any purpose to do so, but gave the excuse for not doing so that he did not have time.

Fannin testified that he made his exit from Blackburn's restaurant in time to see some of the blasts of the deceased's pistol when he was firing the shots referred to, and that they were aimed down through the porch. He then said: "We walked on up to the house and Mack said: 'Don't you know it's against the law to shoot on the highway; you are liable to hurt somebody,' and Casey said: 'It ain't none of your God-damned business,' and his wife was standing there and she said: 'He has been about to shoot me,' and it looked like she pushed him with her elbow, and about that time he started up with his gun and Mack shot."

The testimony of appellant and Fannin, with that given by the three prosecuting witnesses, was all of the testimony of what occurred *at the time* of the commission of the homicide, and it undoubtedly presents a case submittable to the jury, as well as to sustain the verdict returned by it. Neither of the Commonwealth's witnesses were impeached for truth and veracity or otherwise except by the contradictory statements given by appellant and Fannin.

In order to sustain the alleged error of insufficient evidence to authorize a conviction the testimony of the three prosecuting witnesses would have to be completely discarded, and to accept the testimony of appellant, and that of his fellow officer, each of whom attempted to show that the shooting was done by appellant in his necessary self-defense.

The only argument made by appellant's counsel in support of ground (5) is the failure of the court to direct an acquittal (which we have already disposed of),

and error in giving instruction five. It defined the right of a peace officer in his efforts to preserve the peace and in arresting violators of the law, as well as their right to carry arms, and then said: "If the said Casey Newsome refused to submit to arrest and so conducted himself in the presence of the defendant, then defendant had the right to use such force as was necessary, or reasonably appeared to him to be necessary, but no more to overcome the forcible resistance of the said Casey Newsome, if any, and if under these circumstances he shot and killed the said Casey Newsome, said shooting and killing was excusable, if the defendant could not otherwise overcome the forcible resistance, if any, of the said Casey Newsome, or if it reasonably appeared to him that he could not do so."

The objection to that instruction is directed to the statement therein that: "* * * if the defendant could not otherwise overcome the forcible resistance, if any, of the said Casey Newsome, or if it reasonably appeared to him that he could not do so."

We are cited to no case wherein the qualification contained in the latter excerpt was held to be prejudicial error, nor has any one been cited by counsel sustaining his criticism. Besides, the instruction is substantially the same as contained in "Stanley on Instructions to Juries," page 1171, section 879. We therefore conclude that ground (5) is without merit.

Grounds (6) and (7) complaining of remarks made by prosecuting counsel in his argument to the jury consist in the counsel's reference to the fact that appellant and his witness, Fannin, were each armed with big pistols, though their right to carry them as officers was not denied, nor in anywise drawn in question by the prosecuting counsel. Counsel further commented that in performing their duty as such armed officers they should use their weapons only in the exercise of their right of self-defense or to compel the prospective prisoner to submit to arrest when resistance is made to such an extent as makes it necessary to effect the arrest.

The cases cited in support of this ground consist in counsel making statements of fact which the evidence does not sustain and thereby converting himself into a witness as to incriminating facts to which no witness

testified. Also when the language employed by counsel is extremely abusive of the defendant on trial so as to excite the passion of the jury and cause it to render a verdict which it might not otherwise have done. The remarks complained of in this case cannot possibly be given any such effect since it consisted only of counsel's interpretation of the evidence and his recommendation as to the punishment which should be inflicted if defendant were found guilty.

In the case of Housman v. Com., 128 Ky. 818, 110 S. W. 236, 239, the rights and limitations imposed upon prosecuting counsel in his argument to the jury are thus defined:

"Much latitude is of necessity allowed an attorney in the presentation of his case; the only limitations being such as require him to confine himself to the facts introduced in evidence, and the fair and reasonable deductions and conclusions to be drawn therefrom, and the application of the law, as given by the court, to the facts proven. Controlled, regulated, and bounded alone by these limitations an advocate may, with perfect propriety, appeal to the jury with all of the power, force, and persuasiveness which his learning, skill, and experience enable him to command, and of this character of argument the accused may not complain, even though he feels that his conviction may be traceable more directly to the argument of counsel than to the facts proven."

That definition has never, so far as we have been able to ascertain, been criticized or in any manner limited by any opinion of this court since that date. On the contrary it has been followed in numerous cases. We conclude that counsel in this case did not exceed the bounds as given in that opinion.

We have read the cases cited by counsel in support of each of the grounds upon which he seeks a reversal of the judgment, each of which involves a different state of facts not applicable to those appearing in this one which, after all, is to be determined by what occurred at the immediate time of the homicide, the testimony as to which in this case we have already discussed. Upon the whole case we conclude that no prejudicial error was committed authorizing a reversal of the judgment. Wherefore it is affirmed.